'08 CIV 11193

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**BENCHMARK FINANCIAL SERVICES, INC,** on behalf of itself and all others similarly situated,

                    Plaintiff,

    v.

**FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., MARY L. SCHAPIRO, RICHARD F. BRUECKNER, T. GRANT CALLERY, TODD DIGANCI and HOWARD M. SCHLOSS.**

                    Defendants.

RECEIVED
DEC 23 2008
U.S.D.C.S.D.N.Y.
CASHIERS

**Case No.**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## COMPLAINT

## INTRODUCTION

1.      Through its counsel, Plaintiff Benchmark Financial Services, Inc. ("Plaintiff" or "Benchmark"), for its Complaint against defendants Financial Industry Regulatory Authority ("FINRA") (f/k/a the National Association of Securities Dealers, Inc., or "NASD"), Mary L. Schapiro, Richard F. Brueckner, T.

Grant Callery, Todd Diganci and Howard M. Schloss  (all Defendants are collectively referred to herein as the "Defendants"; Defendants Schapiro, Callery, Diganci, and Schloss are collectively referred to herein as the "Officer Defendants"), asserts, based on personal knowledge as to itself and its own acts, and otherwise upon information and belief based upon the investigation of counsel, which included, among other things, a review of public documents pertaining to FINRA, as well as discovery materials in related litigation that have been made publicly available, as follows:

2.      This case is about a corporate transaction effectuated by deception.  It focuses chiefly on the misrepresentations Defendants made about a $35,000 payment to NASD Members to induce them to vote "yes" on by-law changes that were necessary to effectuate a regulatory consolidation (the "Transaction") between NASD and the New York Stock Exchange Group, Inc. ("NYSE") as well as other contemporaneous misrepresentations and misconduct, including the following:

> **"Q:  Can NASD increase the amount of the $35,000 one-time special member payment?**
> **A:  A larger payment is not possible.  NASD is a tax-exempt organization and therefore is limited by tax laws regarding size and source of payments it can make to its members."**
> – NASD's Proxy Statement for its proposed merger with the NYSE

*"The one-time payment of $35,000 is the maximum amount the IRS will permit NASD to make to members and still retain tax-exempt status."*
     – NASD's website providing information about the proposed merger

*"What would make the IRS not endorse this deal would be if the NASD provided Members with more than 35k."*
     – NASD minutes of its "road show" to promote the merger

3.     Such misrepresentations were made in a proxy statement issued and disseminated to NASD Members on or about December 14, 2006 soliciting NASD Members' support for by-law changes necessary to effectuate the Transaction (the "Proxy Statement"), on NASD's website, and at "road shows" held to promote the Transaction.  The Transaction closed in July 2007, leading to the creation of FINRA.

4.     The Officer Defendants stood to gain substantially by the Transaction, in terms of enormously higher compensation and benefits, vastly elevated prestige and powers resulting from the virtual monopoly regulatory authority created by the Transaction, and the higher degree of control over the Board of the consolidated entity.

5.     The Officer Defendants reaped huge financial rewards from the Transaction.  Set forth below is a chart showing the individual compensation of each Officer Defendant for calendar years 2005-2007:

| Name | Year | Title | Compensation | Contributions to employee benefit plan & deferred compensation | Expense account and other allowances | Total compensation | Increase (%) |
|---|---|---|---|---|---|---|---|
| Mary L. Schapiro | 2006 | Same | $1,727,640 | 233,236 | 38,855 | 1,999,731 | |
| | 2007 | Chief Executive Officer | $2,502,640 | 614,788 | 23,398 | 3,140,826 | 57% |
| Todd T. Diganci | 2006 | Executive Vice President and Chief Financial Officer | $930,391 | 53,930 | 491 | 984,812 | |
| | 2007 | Same | $1,096,410 | 61,378 | 2,582 | 1,160,370 | 17.8% |
| Howard M. Schloss | 2006 | Executive Vice President | $653,694 | 0 | 2,256 | 655,950 | |
| | 2007 | Same | $784,945 | 0 | 4,518 | 789,463 | 20.3% |
| T. Grant Callery | 2006 | Executive Vice President & General Counsel | $575,762 | 67,557 | 216 | 643,535 | |
| | 2007 | Same | $703,682 | 105,470 | 468 | 809,620 | 25.8% |

The amounts of total executive compensation are eye-popping by any measure, but are especially staggering for a non-profit institution. On information and belief the dramatic increases from 2006 to 2007 resulted from the completion of the Transaction in July 2007. The 2007 figures actually underestimate the true gains the Officer Defendants received from the Transaction since they reflect only about five months of income for that year. Upon information and belief the Officer Defendants will receive even higher gains in total executive compensation in subsequent years.

6. Due to these substantial benefits to be gained by the Transaction, time was of the essence to the Defendants in effectuating the Transaction, and they took

a number of measures designed to obtain the necessary member approval as quickly as possible with as few problems as possible.

      7.    To achieve their objective, Defendants engaged in the following course of wrongful conduct:

      A.    Defendants employed a series of at least five material misrepresentations to the Members:

      (1).    That the most Members could receive in the Transaction was $35,000;

      (2).    That the source of the funds for the Member payments was projected future savings resulting from anticipated efficiencies of the consolidated entity;

      (3).    That if the Members voted against the Transaction, the SEC unilaterally would impose the same changes or would impose changes less favorable to Members;

      (4).    That the Members would not receive *any* monetary payment if the Transaction was not consummated as proposed; and

      (5).    That all Members, including those that were not also NYSE members, would benefit from certain unspecified "efficiencies" created by the Transaction.

B.    Defendants issued the Proxy Statement and held the Special Meeting to approve the Transaction before receiving the IRS's ruling on how much money could be paid to the Members.

C.    Defendants issued the Proxy Statement and held the Special Meeting to approve the Transaction before receiving a Fairness Opinion from a qualified and reputable expert as to the fairness of the Transaction and the Member payments.

8.    Defendants misrepresented to Members that the most they could receive in the Transaction due to a cap imposed by the IRS or the Tax Code was $35,000 each. Defendants also presented the amount of this "one-time special member payment" as non-negotiable. By doing this, Defendants hoped to avoid a protracted, distracting, and potentially deal-breaking controversy over how much Members should receive in the Transaction. It was essential that the Member payments be non-negotiable and appear to be the maximum amount possible in order to avoid further Member scrutiny, demands for further valuations, and a possible bidding war that could delay or derail the Transaction. In addition, once Defendants made these statements, they had to stick with them or risk reduced credibility with Members about the merits of the Transaction and the delay, scrutiny, opposition, and controversy they were seeking to avoid.

6

9.    In the nearly two years that several NASD Members have repeatedly challenged the representation about the $35,000 cap in court and administrative proceedings, the NASD has responded by arguing: (a) that it and its officials are immune from suit; (b) that the courts have no jurisdiction to hear the challenge; (c) that the issue is an SEC matter; (d) that NASD Members have no right to know whether they were told the truth; and (e) that the truth should be kept secret from the public. *But it has never denied the charge.* Despite its many opportunities to set the record straight and end the matter, the NASD has *never* reaffirmed the truthfulness of its representations, instead persisting in its stonewall of the matter.

10.    Defendants misrepresented the source of the funds for the Member payments. Defendants told Members in the Proxy Statement that the Member payments would be funded by the "expected value of the incremental cash flows that will be produced by the consolidation transaction." This was false. The true source of the funds for the Member payments was an over $1 billion fund that constituted a portion of NASD's "Members Equity," a pool of cash that had been amassed largely as a result of the development and sale of the NASDAQ stock market trading system. The misrepresentation about the source of funds was designed to deceive Members into believing they should accept the amount offered lest they upset the NASD's projections of future efficiencies and cause difficulties for the consolidated entity going forward. Defendants knew that if they told

Members the truth – that they would be paid $35,000 each (or a total of $175 million) out of their <u>own equity fund</u> of more than <u>$1 billion</u>, they risked a wide-open valuation demand scenario that would have delayed, invited more scrutiny concerning, and potentially even threatened the whole Transaction.

11.    Defendants misrepresented that if the Members voted against the Transaction, the SEC unilaterally would impose the same changes as those proposed anyway or would impose changes less favorable to Members.  The Defendants had no basis in fact to make such a thinly-veiled threat, designed to coerce the Members to promptly vote in favor of the Transaction.

12.    Another threat Defendants misrepresented to Members was that they would not receive *any* monetary payment if the Transaction was not consummated as proposed.  In fact, the Members could have received a much *higher* payment if the Transaction were restructured in their best interests.

13.    Defendants' representation in the Proxy Statement that all Members would benefit from certain unspecified "efficiencies" created by the Transaction also was false.  Such benefits would only accrue to those NASD Members that were also NYSE Members.  NASD Members that were not also NYSE Members would not benefit from the so-called "efficiencies;" in fact, such Members have to bear the burden of hiring an additional 470 largely redundant employees to its payroll, perform functions formerly performed by the NYSE, and pay for the

privilege of taking on such added burdens – to the tune of a $103 million payment to the NYSE.

14.    Defendants were in such a hurry to expedite approval of the Transaction that they did not even wait for the Internal Revenue Service ("IRS") to respond to NASD's request – which it apparently believed it was obliged to make – for a private letter ruling as to the amount that could be paid to Members without causing NASD to lose its tax-exempt status. Defendants issued the Proxy Statement to the Members requesting their favorable vote on the Transaction and held the Special Meeting to approve the Transaction <u>before</u> the NASD actually received the IRS's response. Once the IRS provided their Private Letter Ruling indicating how much could be paid to each Member in the Transaction, Defendants determined to keep that information secret from its Members and the public.

15.    Nor did Defendants wait to receive a Fairness Opinion of an independent expert as to the fairness of the terms of the Transaction and the Member payments. As with the IRS Private Letter Ruling, Defendants issued the Proxy Statement and held the Special Meeting <u>before</u> receiving the Fairness Opinion. And, like the IRS Private Letter Ruling the conclusions of the Fairness Opinion were kept secret from the Members and the public, rather than being made transparent.

16.    Contrary to Defendants' repeated and adamant claims, a much higher Member payment was not only possible but feasible; that the amount of the payment was material to Plaintiff and other members of the Class defined below; and that Plaintiff and all other Class members were damaged by Defendants' course of misstatements and breaches of fiduciary and other duties owed to the members of NASD. Defendants, who are charged by law with regulating the truth and adequacy of disclosures by the Members of NASD and NYSE, misstated facts – repeatedly, directly, uniformly and in writing – to the Members of the Class when they made the unqualified claim, beginning in November 2006, that tax laws imposed a $35,000 ceiling on the payment to NASD Members in connection with the Transaction.

17.    Documents that NASD subsequently filed with the SEC make clear that NASD's oft-chanted mantra that the Code imposed a $35,000 limit on the payment to NASD members was simply untrue. While the Code might impose some limit (depending on the structure of the Transaction), the $35,000 limitation was imposed by Defendants, not the IRS. Documents recently made available for public dissemination demonstrate that Defendants viewed the payments as necessary in order to secure NASD Members' approval for by-law amendments contemplated by the Transaction.

18.     Plaintiff alleges claims on behalf of a Class of most, but not all, NASD Members, as set forth below.  Plaintiff seeks damages (including substantial punitive damages) and restitution, but does not seek injunctive, remedial, structural or equitable relief that would unwind or otherwise modify the Transaction.  This Complaint does not challenge the wisdom of the consolidation of NASD and NYSE, two self-regulatory organizations ("SROs"), a transaction encouraged and approved by the Securities & Exchange Commission ("SEC").

19.     This action is brought on behalf of Plaintiff and the Class, which consists of all Members of record of NASD (other than those who were also concurrently Members of NYSE) that were entitled to vote for purposes of the Special Meeting of NASD members held on January 19, 2007 ("Special Meeting") by proxy or in person.  The Member vote by proxy and otherwise at the Special Meeting, appears to have approved the by-law amendments.

20.     The gravamen of the Complaint is that Defendants unlawfully obtained NASD Members' consent to amendments to NASD's by-laws (that were necessary to facilitate the Transaction) by misstating material facts – repeatedly. The cynosure of the campaign to obtain Member approval of the Transaction was the NASD's one-sided, deceptive and factually incorrect Proxy Statement that purportedly described the reasons for, sources of, and purported limitations on the

$35,000 payment that served as a monetary inducement to small NASD firms to vote in favor of the proposed amendments and the Transaction itself.

21.     The Defendants violated Delaware law when they misrepresented that tax considerations imposed a $35,000 payment cap. The amount of the payment and cap was material to Members of the Class.

22.     Plaintiff brings this suit to, among other things, recover damages consisting of the difference between what NASD *actually* paid its Members upon the closing of the Transaction, and what it *could* have paid its Members upon the closing of the Transaction without causing NASD to lose its tax-exempt status. Upon information and belief, NASD could have paid NASD members a proportionate share of Members' Equity far in excess of $35,000 per member. Indeed the precise amount that could have been paid is determinable from NASD records that have not been made public, including, but not limited to, documents filed under seal in related litigation.

23.     The Officer Defendants and Defendant Brueckner can make no valid claim for immunity for the conduct complained of in this litigation because their actions were not regulatory in nature but related to the business affairs of the NASD. The huge salaries and rich compensation packages of the Officer Defendants in this litigation dwarf those of even the most senior government officials, including the Chairman of the SEC and the President of the United States,

12

as well as almost all other non-profit executives.  Upon information and belief, the Transaction complained of herein created a windfall of compensation for the Officer Defendants.  Further militating against any legitimate claim of immunity in this case is the nature of the conduct for which Plaintiff seeks redress.  This Complaint seeks to remedy the actions of a Delaware corporation relating to corporate governance controlled by the Officer Defendants and Defendant Brueckner – actions that are not in any way regulatory in nature.  Instead, the conduct complained of herein deals exclusively with the proprietary interests of the association and its Members.

## JURISDICTION AND VENUE

24.     The Court has diversity jurisdiction over this matter pursuant to 28 USC §1332(a), because there is complete diversity of citizenship between the Plaintiff and every Defendant and the amount in controversy exceeds $75,000 per Class member, exclusive of interest and costs.

25.     Plaintiff asserts its claims under state law, in particular the laws of Delaware, and not federal law.  There is no federal question presented.

26.     Venue is proper in this District because a substantial portion of the conduct giving rise to Plaintiff's claims, occurred in or were directed from the Southern District of New York.

## PARTIES

27.    Plaintiff Benchmark Financial Services, Inc. is a Florida corporation with its principal place of business in Florida.  At the time of the Special Meeting, and at all other relevant times, Plaintiff was a Member of NASD, a non-profit membership organization.  Plaintiff is not a Member of NYSE.  The suffrage rights of Plaintiff and each Member of the Class were negatively affected by the conduct complained of herein.

28.    Defendant Financial Industry Regulatory Authority ("FINRA") is a non-profit corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1735 K Street, NW, Washington, D.C. 20006.  FINRA is an SRO established to oversee the conduct of brokers and dealers in securities, and to deal with customer disputes.   Its regulatory activities are in part governed and supervised by the SEC.  Its non-regulatory activities, such as those at issue here, are not governed or supervised by the SEC.  Until approximately July 30, 2007, FINRA was known as NASD.  The corporation amended its Certificate of Incorporation to change its name as part of the Transaction.  FINRA will be referred to herein as "NASD" with respect to events occurring up to and including the consummation of the Transaction, and as "FINRA" with respect to events occurring after the consummation of the Transaction.

14

29.     Defendant Mary L. Schapiro is a resident of the District of Columbia who serves as Chairman and CEO of FINRA.  Prior to the consummation of the Transaction, Ms. Schapiro was Chairman and CEO of NASD and actively and publicly involved in lobbying for ratification of the Transaction and changes to NASD's by-laws, all of which benefited her personally, at the expense of Plaintiff and the members of the Class.

30.     Defendant Richard F. Brueckner is a resident of Virginia.  At all times relevant to this litigation, Mr. Brueckner was the Presiding Governor of NASD's Board of Governors and was elected to the Board by the Members to be their representative.

31.     Defendant T. Grant Callery is a resident of Maryland.  At all times relevant to this litigation, Mr. Callery was Executive Vice President and General Counsel for NASD.  Mr. Callery played a key role in publicly promoting the Transaction and providing inaccurate information with respect to the purported IRS limitation on payments to NASD Members, all of which benefited him personally, at the expense of Plaintiff and the Members of the Class.

32.     Todd Diganci is a resident of Virginia.  At all times relevant to this litigation Mr. Diganci was Executive Vice President and Chief Financial Officer of NASD.  Due to Mr. Diganci's position at NASD he was intimately acquainted with the details of the Proxy Statement because he played a key role in drafting it and

15

other documents in connection with the Transaction. The Transaction benefited him personally, at the expense of Plaintiff and the members of the Class.

33.    Howard M. Schloss is a resident of Virginia. At all times relevant to this litigation, Mr. Schloss was Senior Vice President, Communications and Government Relations of NASD. As a result of his position, Mr. Schloss played a major role in the campaign to secure support from the NASD Membership for the Transaction, which benefited him personally, at the expense of Plaintiff and the Members of the Class.

34.    By reason of their positions of trust, whether obtained by virtue of employment or election by the NASD and its Members, the Officer Defendants and Defendant Brueckner owed duties of candor, honesty, disclosure, fair dealing and loyalty to Plaintiff and Members of the Class in carrying out the business operations and governance of the NASD.

35.    The Officer Defendants and Mr. Brueckner individually and collectively controlled the actions of NASD described herein, including *inter alia*, the statements at issue in this case.

## **FACTS**

### A.    **NASD'S FOUNDING AND FUNDAMENTAL PRINCIPLE**

36.    The NASD is a Delaware corporation, the hallmark of which was a democratic "one member, one vote" principle, dating to the 1930s. By design,

16

NASD's structure and nature reflected a democratic, egalitarian, and populist industry organization of dispersed, independent participants – a nature deliberately opposite to the NYSE "club," and a nature radically and irreversibly altered by the Transaction.

37.     At the time NASD came into being, the NYSE had served as the dominant model of securities firms' SROs. Publicly and legally, the NYSE achieved a reputation as a "club," in which powerful insiders lorded over their economic inferiors, without regard for the public's concerns. Congressional hearings uncovered the NYSE's internal failings leading to the Crash of 1929. By 1938, a scandal concerning unpaid loans to the NYSE's President from member firms demonstrated that the undemocratic "club" of the NYSE was an unfit model for other SROs.

38.     In 1938, Congress enacted the Maloney Act, authorizing a self-regulatory association of independent securities dealers. By June of 1939, the newly formed IBCC (the predecessor of NASD) filed its registration with the SEC and an order ensued, stating:

> It is one of the objectives of the Maloney amendment, that national securities associations ***shall be organized on a democratic basis***. Accordingly, the proposed By-Laws provide for an ***elected*** 21-man national Board of Governors.

S.E.C. Release No. 2045, 1939 WL 38197, at *2 (1939) (emphasis added). The importance of the egalitarian principle in the governance of the NASD resounds in this commencement statement. It added, as to the "elected 21 man national Board of Governors" and local bodies, that "each member, whether *large or small*, has one vote in the election of these bodies." *Id.* at *2 (emphasis added).

39.     Congress left it to the NASD to organize itself with reference to a body of existing – that is, state law – principles. NASD chose to be a Delaware corporation. Placing voting control in the hands of NASD's Members – subject to the guarantees of Delaware corporate law – enabled the Member firms to avoid the large-firm domination for which NYSE was notorious.

40.     Given the statements at NASD's founding regarding its purpose and goals, the elimination of the "one firm, one vote" rule proposed as part of the 2007 consolidation constituted a radical departure from these long-established precepts. Because the NYSE large Members were unwilling to be regulated by the "one firm, one vote" rule, however, completion of the Transaction was conditioned upon the acquiescence of a majority of NASD Members to by-law changes that would eliminate such a structure. Faced with the reality that 90 percent of NASD's Membership consists of small firms with only a few brokers, which might perceive the new structure as a diminution of their voting rights, the Officer Defendants and

Defendant Brueckner impermissibly resorted to deception and coercion in order to achieve their goals.

## B. NASD PRIOR TO THE TRANSACTION

41.     Prior to the Transaction, NASD had approximately 5,100 Members, of which only about 200 of the largest and most powerful were also members of the NYSE.

42.     In addition to functioning as an SRO, NASD, until 2005, owned the NASDAQ stock exchange, which it sold for proceeds of approximately $1.5 billion.

43.     The sale of NASDAQ left NASD flush with cash.  NASD's 2005 Annual Report reflects cash and cash equivalents on hand of $296,057,000, and total assets of over $4.3 billion as of December 31, 2005.  NASD's pool of cash had been used to offset member fees and issue rebates.  ("NASD Investment Fund Swells from Sale of NASDAQ Stock; It will Deploy Cash to Take on the NYSE, Observers Say") (Investment News 6/12/06).  NASD's asset-heavy financial condition was reflected on its balance sheet by $1,611,264,000 in "Members' Equity" as of December 31, 2005, a reflection of the collective ownership interest of NASD by Plaintiff and the members of the Class.

## C.   **THE TRANSACTION**

44.    On November 28, 2006, NASD and NYSE announced a plan to combine their regulatory functions in a restructured NASD that would be renamed FINRA.  The Transaction was announced in a press conference with the Chairman of the SEC on November 28, 2006, and the announcement was followed by a month-long national tour of senior NASD officials hyping the benefits of the consolidation, akin to the "road shows" that investment banks employ to promote securities offerings.

45.    The principal goal of the Transaction (as expressed by Defendants) of the "consolidation plan" was "to establish a single self-regulatory organization to serve as the sole U.S. private-sector provider of Member firm regulation for securities firms doing business with the public."  This consolidation was ostensibly designed to remove duplicative regulation over dual Members and increase regulatory efficiencies and was endorsed structurally by the SEC.

### 1. **Terms of the Transaction**

46.    The substance of the Transaction was as follows:

(1) NYSE Regulation.  The Transaction called for the retention of approximately

470 employees of NYSE Regulation by NASD, the cessation of regulatory

operations by NYSE Regulation, and the renaming of NASD as FINRA.

NASD, renamed FINRA, would retain all assets and liabilities it previously

held.  It would be responsible for all Member firm regulation, arbitration and

mediation, and all other current NASD responsibilities, including market

regulation by contract for NASDAQ, the American Stock Exchange, and the

International Securities Exchange.  In addition, the consolidated organization

would be responsible for the professional training, testing and licensing of

registered persons, and industry utilities, such as Trade Reporting Facilities and

other over-the-counter operations.

(2) Amendment of NASD's by-laws to change its governance structure:  the by-

laws would be amended to provide for the appointment of a transitional Board

of Governors, as well as a procedure for selecting future Boards:

(a) Composition of FINRA Board of Governors:  The new governance

structure eliminated the historically democratic "one member, one vote"

rule pursuant to which NASD had been governed since its inception.

(i)   FINRA was designed to be and is headed by Defendant Mary

Schapiro.  Its leadership is comprised of a combination of so-called

"Public" and "Industry" Governors.  However, instead of the entire

NASD Membership voting on the Industry members of the Board,

Industry Governor positions on the Board were to be allocated based

on firm size and Public Governor spots were to be chosen by the

Boards of NASD and NYSE.

(ii)   NYSE appoints 5 Public Governors, 1 NYSE floor representative, and nominates 3 "large member firm" Board members for election.

(iii)   NASD appoints 5 Public Governors, 1 independent dealer or insurance representative, and nominates 3 so-called "small member firm" Board members[1].

(iv)   Jointly, NASD and NYSE appoint 1 Public Governor, 1 investment company representative, and nominate 1 medium sized member firm board member.  As a point of comparison, at the time of the proxy vote, NASD Members voted for 15 of the 16 non-staff seats on the 17-member board. Unlike NASD, where no board member served on its nominating committee, the nominating committee of FINRA is a board committee overseen by Defendant Schapiro.

(b) Transitional Board of Governors:  During a three year transitional period the CEO of NYSE Regulation will serve on the FINRA Board of Governors after which time the total number of governors will be reduced by one permanently.

1. ————————————

[1]"Small member firms" are defined as those with up to 150 registered persons, while the great majority of NASD member firms employ only one or two registered persons.  The definition thus further diluted the control that smaller firms would have after the proposed Transaction.

22

(3) A one-time payment of $35,000 to NASD Members;

(4) NASD payment to NYSE of $103.0 million;

(5) NASD to pay NYSE the net book value of regulatory assets of NYSE

Regulation, represented to be approximately $15.5 million; and

(6) New SRO to enter into a five-year services agreement with NYSE for an

amount not to exceed $10 million per year to lease space and for the related

service costs.

### 2. **Approval and Closing of the Transaction**

47.    The structure of the Transaction required NASD to amend its by-laws.

Those by-law changes required a majority vote of NASD's Members.  Defendants

solicited votes of NASD Members in support of these amendments by

disseminating the Proxy Statement, dated December 14, 2006, which contained

multiple false and misleading statements of material facts, and through in person

meetings and telephone calls, website statements, and road show communications,

through which the false and material statements were repeated uniformly and

perpetuated.

48.    Based upon all of these communications, the NASD Members voted

to approve the amendments to the by-laws.  The voting commenced on December

18, 2006, and ended on January 19, 2007.  NASD reported that the votes in favor

of the amendments narrowly constituted an absolute majority of NASD Members.

49.     On March 19, 2007, NASD filed with the SEC a 144-page form that started File No. SR-2007-023, a "Proposed Rule Change by NASD," using the general form (19b-4) for approving the rules changes of SROs.  The very next day, on March 20, 2007, the SEC published its "SEC Release," "Self-Regulatory Organizations; National Association of Securities Dealers, Inc.; Notice of Filing of Proposed Rule Change to Amend the By-Laws of NASD to Implement Governance and Related Changes to Accommodate the Consolidation of the Member Firm Regulatory Functions of NASD and NYSE Regulation" (Release No. 34-55495; File No. SR-NASD-2007-023), for notice and comment.

50.     The NASD's filing and the SEC Release did not mention, let alone describe, include or request comment on: (1) the Proxy solicitation of NASD Members; or (2) the fact of the $35,000 payment, or related statements about the purported IRS-imposed ceiling on the NASD special members' payments.

51.     On July 26, 2007, the SEC issued an Order approving NASD's proposed by-law changes.

52.     On July 30, 2007, the Transaction closed, and NASD became FINRA.

**D.     THE PROXY STATEMENT**

53.     Upon information and belief, the Proxy Statement was prepared jointly by all Defendants.  It was disseminated to NASD member firms with a cover letter signed by Ms. Schapiro and Mr. Brueckner.  The Proxy Statement was

24

accompanied by a form of proxy and instructions about the various means by which NASD Members could vote upon the proposed by-law amendments.

54.    First and foremost, the Proxy Statement deceptively touted the purported financial benefits to NASD Members that would flow from the Transaction. With respect to the "special member payment" and other material terms regarding the Transaction, the Proxy Statement represented as follows:

> The consolidation will reduce the costs of regulation. In connection with the Transaction, a one-time special member payment will be made to NASD members. The special member payment will be $35,000 per NASD member. In addition, we will discount the annual gross income assessment to members for a period of five years, subject to annual Board approval. Each firm would receive a discount of $1,200 per year, which is the minimum annual gross income assessment charge and the total amount of the annual gross income assessment that approximately 2,400 member firms pay. As a result of this discount, the approximately 2,400 member firms currently paying the minimum would pay no gross income assessments charge over the five-year period. It is expected that we will benefit from economies of scale and will be able to reduce regulatory fees starting in the third year after the closing of the Transaction.

Proxy Statement at 4.

55.    With respect to the amount of the payment, the Proxy Statement stated falsely that a Member payment greater than $35,000 was "not possible":

> *Q: Can NASD increase the amount of the $35,000 one-time special member payment? A: A larger payment is not possible.* NASD is a tax-exempt organization and therefore is limited by tax laws regarding size and source of payments it can make to its members. The special member payment of $35,000 per NASD member ... will be funded

25

by—and therefore limited by—the expected value of the incremental cash flows that will be produced by the consolidation transaction.

Proxy Statement at 7 (emphasis added).

56.   The Proxy Statement also touted efficiencies that would be achieved by consolidating the operations of NASD and NYSE Regulation.  The Proxy Statement stated that the "consolidation plan… will make private-sector regulation more efficient and effective."  It further stated that the consolidation would "greatly reduce unnecessary regulatory costs while increasing regulatory effectiveness for all firms," and that NASD was "committed to reducing regulatory costs and burdens for firms of all sizes through greater regulatory efficiency."

57.   The Proxy Statement described the changes in corporate governance that would result from the Transaction, and explained that these changes were necessary to secure NYSE Members' approval of the consolidation:

> As a result of the By-Law amendments, members will no longer have the ability to vote for all Board candidates in elections, but will have an opportunity to vote on designated seats on the Board.  Specifically, firms will vote for industry nominees that are similar in size to their own firm.  This means that small firms and large firms will vote for candidates running for the seats reserved for their firm size and the mid-sized firms will likewise vote for the mid-sized firm seat.  All other Board seats will be appointed.  All members will continue to have the ability to vote on any future By-Law amendments, as well as district elections.  In addition, the New SRO will continue NASD's current practice of subject-matter expert standing committees and NASD's current notice and comment process for rule-making.

> …

26

> *Q: Why is it being proposed that all firms no longer vote on all Board candidates in elections?*  **A:** The proposed governance structure is a result of extensive negotiations between NASD and NYSE Group, including extensive input from the current NASD Board of Governors which is populated by a diverse group of industry and public members.  As with any negotiation, certain compromises are reached.  A bedrock principle of NASD during the negotiation was to continue with broad, diverse industry representation on the Board of Governors….  The new board structure, including voting rights for board members, reflects a blend of current NASD and NYSE Group structures.  A deal would not have been reached with NYSE Group if each member of the new SRO had the right to vote on all Board candidates in elections.

Proxy Statement at 8.

58.    The Proxy Statement also represented coercively that adverse consequences could result from the failure of NASD Membership to approve the by-law changes.  According to the Proxy Statement, if the amendments were not approved the "NYSE Group has indicated that it will not proceed with the Transaction," in which event there would be no special member payment, and the SEC likely would act unilaterally to "make its own decision about the structure and governance" of NASD.  The Proxy statement further explains that "the SEC has embraced an NYSE-model of SRO governance that has no industry representation on its Board and has mandated a majority of non-industry representation on the NASD Board.  Therefore, we believe the Transaction is the best way to ensure significant and broad-based industry representation on the Board of Governors

now and in the future." Proxy Statement at 9-10.  Defendants used the threat of SEC intervention in the absence of approval as a coercive club to help secure approval of the by-law changes and the Transaction as a whole.  In essence, NASD Members were instructed to take the money or face the same result with no compensation.

### E.  THE PROXY STATEMENT WAS DECEPTIVE AND MISLEADING

59.    The Proxy Statement was known and intended by Defendants to deceive Plaintiff and the Members of the Class into believing that the $35,000 to be paid to NASD Members was an absolute maximum payment, for tax reasons. Ultimately, as a result of statements contained in the Proxy Statement as described above, together with the pressures put upon many of the NASD Members discussed below, the amendments to the by-laws were approved by what NASD reported as "a majority of a quorum" at the Special Meeting.

60.    The deceptions alleged by Plaintiff were material to Members' votes on the Transaction.  The "carrot" was the financial incentive; *i.e.* the $35,000 special member payment.  Defendants falsely claimed as a fact that the proposed payment could not exceed $35,000.  The Proxy Statement was deceptive because it implied that there was a hard cap of $35,000 imposed by tax laws when that was false.  It was misleading because it failed to disclose that the NASD had not yet

received the IRS's ruling as to the maximum payment the NASD could pay while maintaining tax-exempt status.

61.     It was also untrue that the members faced imminent SEC unilateral action. The "stick" was the threat of SEC unilateral action and no payment should members reject the proposal on the table. In reality, the Defendants had no knowledge of how quickly or in what manner the SEC might react to rejection of the proposal, but were simply determined to present the existing proposal as a "take it or leave it" decision in order to avoid proposed modifications from NASD Members. This threat, and the facts and circumstances surrounding it were also material and should have been disclosed to the membership.

       1.      **The Proxy Statement misinformed NASD Members that the one-time $35,000 payment was the most they could receive in connection with the Transaction; affirmatively stating falsely that "a larger payment is not possible"**

62.     The one-time special $35,000 payment to Members was the principal incentive for NASD Members to vote "Yes." The Proxy Statement states unequivocally and in absolute terms that "**A larger payment is not possible**," basing this purported limitation on requirements established otherwise by the Code and/or by the IRS. This statement was false.

63.     The IRS did not issue a private letter ruling to NASD concerning the payment to Members until March 13, 2007, nearly four months after the Proxy

Statement was issued, and nearly two months after voting closed. This fact alone demonstrates that Defendants' claim that the Code limited the payment to a maximum of $35,000 was highly misleading at the very least.

64.    Once issued, moreover, the *post hoc* IRS private letter ruling did *not* provide a specific limitation on the payment to NASD Members. Instead, the IRS provided a range of permissible payments to Members that would not affect the SRO's tax-exempt status. As the public record now makes clear the $35,000 was not at the top of the range of payments that the ruling endorsed. A heavily redacted, but now-public internal NASD email from Todd Diganci, Executive Vice President and CFO of NASD, dated March 15, 2007, stated that, with the five-year dues reduction (totaling an additional $30 million), the proposed payments would "clearly drive the total payments to member firms *towards* the higher end of the IRS approved range." (Emphasis added). Explicit in Mr. Diganci's statement, however, is that the IRS "approved" a "range" in which the "total payments" were "toward the higher end of the range," but would not exceed the higher range. Clearly implicit in Mr. Diganci's statement is the fact that the $35,000 special member payment proposed was not at the limit of the permissible range of payments, thus, a higher initial payment would have been possible.

65.    To date, NASD has gone to great lengths to keep details of the payment range from its own Members. In the factually related proceeding styled

*Standard Investment Chartered, Inc. v. NASD, et al.,* No. 07-cv-2014 (S.D.N.Y.), FINRA has obtained a protective order shielding from public disclosure, among other things, the substance of the IRS letter ruling.  An appeal is now pending before the Second Circuit concerning this matter.

66.     Despite the unqualified nature of Defendants' mantra that a larger payment was "**not possible**," in a letter to the SEC dated July 16, 2007, Mario Verdolini, one of NASD's tax lawyers, expressed doubt about the amount the NASD could have paid its members: "[T]here are no authorities directly on point that would allow NASD to make the contemplated Member Payment without jeopardizing its tax exemption …. the only way that NASD could make the proposed Member Payment was by securing a private letter ruling from the IRS to the effect that the Proposed Transaction -including the Member Payment - would not affect its tax exemption."  Significantly that letter never made any statement that: (1) $35,000 was the upper limit on the size of payment that could be issued to members; nor (2) that the self-imposed limitation of the payment to $35,000 came from the IRS.

67.     Likewise, and typical of NASD's post-Transaction dissembling, Defendant T. Grant Callery, Executive Vice President and General Counsel for NASD,  told the SEC, "[t]he assertions of some commenters that the proposed $35,000 payments are not so limited, and that NASD can and should distribute its

'Members Equity,' in larger payments of up to $300,000 per member, are simply

incorrect." Even assuming, however, that payments as large as $300,000 would

have run afoul of IRS regulations (an issue that cannot be determined without

discovery), the central question this lawsuit poses is not whether NASD could have

distributed $300,000 per Member, but whether it could have distributed more than

$35,000 per Member and whether Defendants' representations that it could not

were unlawful.  Plaintiff contends that the unequivocal answer is "Yes."

68.    Defendants spoke consciously and deliberately in their

misrepresentation that "**A larger payment is not possible**" and in other similar

misrepresentations.  Existing IRS revenue rulings, however, would have allowed

more than $35,000 to be paid (*e.g.*, as refunds of dues previously paid), without

jeopardizing NASD's tax-exempt status.  The Officer Defendants and Defendant

Brueckner knew this well.  NASD itself has paid out substantial rebates to

Members since 2000 without losing its tax-exempt status.

69.    The decision to offer a $35,000 payment was apparently made at the

Board meeting held on November 21, 2006.  The redacted minutes to that Board

Meeting fail to document any $35,000 limitation and in fact state that the

"[g]overnors gave their views on amounts ranging from $30,000 to $40,000" and

"expressed the view that regardless of the amount agreed upon, it was paramount

that the figure not be subject to negotiation."  The fact that a $40,000 payment was

openly discussed suggests that a larger payment than $35,000 was possible and the "paramount" decision that the figure "not be subject to negotiation" at a minimum suggested it was the NASD Board, not the IRS, that made the determination that a "higher payment is not possible."

70.     The Proxy Statement did not disclose that NASD was involved in a lengthy and unconcluded (as of November 2006) exchange with the IRS concerning the amount of the permissible payment.

71.     Further, NASD systematically analyzed how much money it would take to secure the required vote, as part of limiting the amount distributed.  For example, NASD's analysis indicated that 672 NASD members with revenues of $75,000 or less would vote in favor of the by-law changes, apparently due to the relative amount of revenue at stake for those firms.  Thus, on information and belief, the amount of the Member payments was determined by Defendants' calculation of the amount needed to secure the necessary approval vote, not by the IRS or the Tax Code.

72.     The Proxy Statement likewise failed to disclose the requisite advice of NASD's "independent third-party financial advisor" that must be retained to determine whether "the Transaction [was] fair."  The Proxy Statement does not even disclose the identity of the requisite financial advisor.  Now public NASD documents reveal that the NASD Board meeting on November 21, 2006, was the

first date on which the NASD Board discussed hiring a firm to provide an opinion as to the fairness of the Transaction.  The NASD concealed this because it is simply indefensible under Delaware law that Defendants rushed out the Proxy Statement with no ruling from the IRS as to the maximum share of the "Members' Equity" that could be paid to NASD Members, nor any opinion as to the fairness of the Transaction (in the form monetarily beneficial to Defendants, but including only a $35,000 special members' payment) by any qualified and recognized financial expert.

73.     The Proxy Statement did provide a partial description of events and some of the purported reasons for the Board's decision to recommend to NASD Members that they approve the by-law changes.  For instance, pages 13-16 of the Proxy Statement provide a partial recitation of the history of negotiations and identify selective reasons why Members should vote "Yes."  However, the Proxy Statement failed to disclose whether the Defendants sought or obtained any expert opinions as to the fairness of the Transaction and the $35,000 special member payment or with respect to any actual IRS or other limitation on such payment, whether by private letter ruling, legal precedent or otherwise.

74.     The Proxy Statement is devoid of any discussion about what steps, if any, the Board took to maximize the amount to be paid to NASD Members and the Board minutes make clear that no serious effort was made.  Instead, the Board's

offer of $35,000 carried with it the implicit representation that Defendants' actions

satisfied their duty to the members of the Class to maximize such payment,

consistent with NASD's own needs for capital.  Indeed, through Defendants'

representation that a larger payment was not possible, NASD Members were told

that the best deal possible had been negotiated, when in reality the Officer

Defendants' and Defendant Brueckner's efforts focused on convincing the NASD

Membership to approve a modest payment, not to determining what level of

compensation was adequate, permissible and fair.  The representation was thus

false and misleading.

75.     In short, there is little doubt that the Defendants merely wanted NASD

to pay to its Members the lowest amount that would work to obtain a majority vote

in favor of the Transaction.

## 2.     The Proxy Statement Misrepresented the Source of the Funds for the Member Payments

76.     Defendants misrepresented the source of the funds for the Member

payments.  Defendants told Members in the Proxy Statement that the Member

payments would be funded by the "expected value of the incremental cash flows

that will be produced by the consolidation transaction."   This was highly

misleading, if not false.  The true source of the funds for the Member payments

was the Members' own $1 billion equity fund.

77.     On information and belief, serious consideration was given to dissolution and the formation of a new entity, which would have provided the highest level of compensation for the sale of small Members' control interests. Indeed, the NYSE wrote in an email that "[t]he signed termsheet expressly states that NASD will 'transfer all its assets, liabilities, equity, revenues, expenses and employees into New SRO, net of any member distribution related to the consummation of this transaction'…. I can understand from a practical point of view it might have seemed easiest to do a name change, but that was not the basis on which the deal went forward." The Officer Defendants later used the changed structure and its associated savings of NASD funds as a basis for seeking an award of huge personal bonuses.

78.     Moreover, the misrepresentation about the source of funds was designed to deceive Members into believing they should accept the amount offered. Defendants knew if they told Members the truth – that they could have been paid far in excess of $35,000 per Member through a dissolution or out of their own $1 billion equity fund, they risked a wide-open valuation demand stampede that would have delayed, invited more scrutiny concerning, and potentially even threatened the whole Transaction, as well as removed a basis for their later request to be rewarded with huge bonuses.

79.    The misrepresentation as to the source of the funds was part of the Officer Defendants' overall scheme to entrench themselves in positions where they and the large Member firms could control the Board of the new, consolidated, and more powerful regulatory body and pay the small Member firms as little as was necessary to obtain their votes to approve the Transaction.  For all intents and purposes, **the Officer Defendants sold out the small Member firms**.

### 3.    The Proxy Statement Misrepresented the Likelihood of SEC Action to Reorganize NASD

80.    While the $35,000 was the manipulatively presented carrot; the overstated threat of SEC action to force consolidation was the stick.  Although the SEC was interested in the regulatory consolidation of NASD and NYSE and, indeed, had actively encouraged it, the Proxy Statement materially overstated the likelihood of unilateral SEC action to reorganize NASD without the consent of its Members.  For example, Defendants stated, with respect to the Transaction:  "We need to get it done now. *We can shape the future of self-regulation now, or we can wait and have it shaped for us.*"  Given its deregulatory stance on a host of issues, there was no serious possibility that the SEC would take matters into its own hands and impose a less desirable governance structure without any monetary payment to NASD Members.  The Defendants' bald statement in the Proxy Statement that "[t]here is every reason to believe that if the By-Law amendments

37

are not approved by the NASD Membership, and the Transaction does not close, the SEC will make its own decision about the structure and governance of SRO" implies that the SEC had communicated to Defendants information to support that statement, when, in reality, the statement was a fabricated but potent scare tactic, intended to coerce NASD members to vote in favor of the by-law changes and the Transaction.

81.     In truth, the authority of the SEC to force a consolidation without a dissolution (and resulting distribution of a much greater percentage of assets) was ambiguous at best.  Moreover, the SEC's sole concern was the simplification that would result from the regulatory consolidation of the two SRO's, not in restricting benefits to NASD Members, nor in expanding the monetary benefit to the Officer Defendants.  The SEC's interest could easily have been met without disadvantaging the NASD Members, had Defendants not insisted on terms to their own monetary advantage.

82.     NASD is not a federally chartered non-profit corporation, nor does it owe its existence to federal law.  Congress left the NASD (and all SROs) free to organize its internal governance and structure subject to private negotiation with Members.  *See* 15 U.S.C. §78c(a)(1) ("The term 'exchange' means any organization, association, or group of persons, whether incorporated or unincorporated").  Instead, NASD is a private, not-for-profit corporation that

38

voluntarily incorporated in Delaware and is governed by the Delaware General Corporations Law and the substantive common law of Delaware. The SEC does not regulate the internal governance of such corporations. Indeed, subsequent to the closing of the Transaction, the SEC announced that it had no real interest in the state law issues posed by whether the Proxy Statement had misrepresentations, further evincing that the SEC's interests stopped with the regulatory consolidation, rather than with the threats attributed by Defendants to the SEC. "This finding as to NASD compliance and members' approval is not a definitive adjudication under state law, such as a trial court would make after an evidentiary hearing, regarding the claim that the proxy statement was misleading." Securities and Exchange Commission Release No. 34-56145A; File No. SR-NASD-2007-023, May 30, 2008.

83.     The wholly deceptive threat of unilateral SEC action (imposing less favorable terms) was designed to coerce NASD Members into voting for the by-law changes necessary to effectuate the Transaction, without additional input, discussion or negotiation with NASD Members.

**4.      The Proxy Statement Misrepresented that NASD/FINRA Would Enjoy "Efficiencies" When the Only Such Benefits Would Accrue to NYSE Member Firms**

84.    The representations by Defendants in the Proxy Statement that all NASD Member firms would benefit from certain unspecified "efficiencies" was untrue.  The substance of the so-called "consolidation" was that NASD would hire 470 employees of NYSE Regulation, would pay NYSE Regulation $15.5 million for "usable and transferrable assets," and would pay NYSE another $103 million in a purported effort to make the transaction "revenue neutral."

85.    The approximately 170 firms that were Members of both the NASD and NYSE would benefit from certain efficiencies created by the Transaction. They are now subject to only a single layer of SRO oversight, and no longer have to finance the regulatory operations of NYSE Regulation.

86.    The vast majority of NASD Member firms that were *not* NYSE Members, however, did not benefit from the "efficiencies" created by the Transaction.  To the contrary, FINRA added 470 largely redundant employees to its payroll and is now required to perform functions formerly performed by NYSE Regulation.  To add insult to injury, under the terms of the Transaction as apparently approved, Plaintiff, the Members of the Class and FINRA were required to *pay* for the privilege of taking on these additional duties, in the amount of $103 million paid to NYSE.  Thus Defendants' attempts to reduce the amount of compensation to NASD Members deprived such members of the full compensation

to which they were entitled and was an unfair manipulation of such Class Members' rights.

### 5.    The Officer Defendants Improperly Structured the Transaction to Benefit Themselves and the Large Member Firms at the Expense of the Small Member Firms.

87.    The Proxy Statement does not explain why the Transaction, as proposed by Defendants, was the chosen means of consolidating the regulatory functions of the two SROs.  Providing few details, the Proxy Statement indicates that the Transaction will make private-sector regulation more efficient and effective.  The consolidation, however, could have been achieved through means far more advantageous to Plaintiff and the Members of the Class, without compromising the other stated goals of the Transaction.  For example NASD could have contributed its operating assets and staff to FINRA, which could have been incorporated as a new entity, so that NASD could have been dissolved after distributing the remainder of its Members' Equity to its Members on a per capita basis.

88.    The Proxy Statement fails to explain that when NASD's Board adopted the resolutions to amend the by-laws and approve the terms of the Transaction, it had not conducted appropriate economic due diligence yet, nor had it meaningfully considered or debated alternative ways to structure the deal to accomplish the same consolidation of NASD and NYSE while acting fairly to

Plaintiff and the Members of the Class.  In fact, a post-Transaction memorandum dated January 25, 2007 and entitled "2006 Achievements: A Report to the Compensation Committee" included a "Special Section: NASD/NYSE Regulatory Consolidation" written with the clear intent of justifying huge bonuses for the Officer Defendants.  The "Special Section" regarding the Transaction boasted that NASD had "steered away from" at least four different deal structures (each of which would have resulted in higher Member payments), including a joint venture, the dissolution of NASD, an "alternating exam approach," and the "formation of an entirely new SRO."

89.    The actual reasons for the Board's recommended vote, including Defendants' self-interest and their unjust enrichment, are material facts.  The size and amount of bonuses accepted by Defendants is a matter about which discovery must be conducted.

90.    Of course, under the existing structure, NASD's Board members sat on both sides of the proposed Transaction, because some were simultaneously NYSE Members.  Furthermore, one of the primary purposes of the by-law amendments was for Defendants (in particular Defendant Schapiro) to wrest control over NASD away from the Members of the Class and transfer it to the NASD Board in general and Defendant Schapiro in particular.  Defendants put

their self-interest before the interests of Plaintiff and the Members of the Class,
whom they were duty bound to serve.

91.     The Proxy Statement acknowledged that Defendants had not
attempted to negotiate any alternative structure nor attempted to preserve the "one
member, one vote" fundamental tenet of NASD while negotiating the
consolidation of the SROs' regulatory functions into a single entity.

92.     As discussed above, the desired goals could have been achieved if
NASD had, for example, dissolved and formed a new regulatory entity, after
distributing to NASD members their *pro rata* share of the NASD Member's
Equity.  For instance, if the NASD were to have dissolved, its Members could have
received well over $1 billion in Members' Equity and still provided the new entity
(the New SRO) with a more than sufficient infusion of capital to effectively and
faithfully achieve its regulatory purposes.  If the deal had been structured such that
the NASD dissolved first, then the New SRO was formed, the distribution of
residual Member's Equity to NASD members could have reached well over $1
billion.  Indeed, the term sheet prepared for the Board referred to the proposed
payment to NASD Members as a "distribution" and, when pressed, Defendant
Schapiro acknowledged that the source of the payment to members was the
proceeds from the sale of NASDAQ.  NASD's own internal documents reveal that
Defendants avoided dissolution of NASD as a means of structuring the

Transaction, even though this option would have offered NASD Members the highest level of compensation for their Members' Equity. In a very real sense, the Transaction as structured denied to Plaintiff and the members of the Class the fair value of the "control premium" to which they were entitled. The control premium was insufficient because it undercompensated Plaintiff and the Class for the value of the voting rights that were sacrificed to accomplish the Transaction.

93.    The NASD could have dissolved and capitalized FINRA. Indeed, the NYSE initially thought the transaction was structured this way. On November 30, 2006, after the term sheet was signed by NASD and the NYSE, NYSE Regulation's General Counsel wrote to NASD expressing confusion about statements in the draft Proxy Statement he had just reviewed, explaining that the NYSE had agreed to the transaction on the understanding that the "New SRO" would be a new entity and the NASD would dissolve. If the transaction had been structured in accordance with the NYSE's understanding of the "term sheet," Members would have been entitled to their equity, which was $1 billion or more. Independently, Delaware law required the transaction to be structured this way because dissolution would have increased the value of the Members' interests and entitled them to substantially more of NASD's assets than they received.

## F.   THE VOTE WAS UNNECESSARILY RUSHED AND WAS PROCEDURALLY UNFAIR

94.    The timing and circumstances surrounding the Member vote also illustrate Defendants' coercion to obtain a "Yes" vote.

95.    Defendants did not disseminate the Proxy Statement to NASD Members until December 14, 2006, the day before the beginning of Chanukah and shortly before Christmas.  They scheduled a vote on January 19, 2007, shortly following the holiday season.

96.    Additionally, Defendants could have and should have awaited the receipt of a Private Letter Ruling from the IRS and an expert opinion as to the fairness of the Transaction, including the special members' payment.  There was no valid urgency or exigency that necessitated mailing the Proxy Statement and soliciting the Members' vote before the IRS issued its ruling and the Fairness Opinion was obtained.  Had the Board waited until after receipt of the IRS ruling and the Fairness Opinion, and the Defendants disclosed all material facts with respect to them, NASD members could have made an informed decision regarding the terms of the proposal and the adequacy of the amount of compensation to Members for their Members' Equity.

97.    Furthermore, Defendants violated their ordinary duties and obligations when they approved the change in control of NASD without adequate information

and documentation. The Board did not obtain, or provide to NASD Members, the IRS Private Letter Ruling, or any fairness opinion, prior to the vote (or since), leaving Members with a dearth of information upon which to judge the fairness of the terms for the proposed Transaction. In prepared questions and answers distributed to NASD Members, the question was posed whether the governance terms were "open to negotiation? Will there be more chances to vote on this?" NASD responded deceptively "We need to get it done now. *We can shape the future of self-regulation now, or we can wait and have it shaped for us…. We negotiated the best agreement possible*."

98.     Ms. Schapiro also denied a "petition" with 119 signatures submitted by the Financial Industry Association ("FIA") the week after the consolidation was announced that asked NASD to slow down the process to give Members six months to examine the deal, provide feedback, and appoint an independent committee to assess the fairness of the deal and understand its impact.   Defendant Schapiro and her colleagues ignored the wisdom of the "petition," rejected it and rushed  the Members' vote as quickly as possible, effectively precluding NASD Members from having an opportunity to review the fairness of the deal with their own experts and advisors, in the wake of an IRS ruling or otherwise.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action under Rule 23(b)(2) and/or 23(b)(3) on its own behalf and as a Class Action on behalf of the Members of the Class as defined below.

100.   The Class consists of:

All NASD Members entitled to vote by proxy or at the Special Meeting on January 19, 2007, excluding those Members who were concurrently members of NYSE.

The proposed definition of the Class is subject to amendment following discovery.

**Numerosity**

101.   The Members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Members of the Class is unknown at this time, it appears that the Class includes approximately 4,800 persons or entities.

**Typicality**

102.   Plaintiff's claims are typical of absent Class Members' claims. Plaintiff and the Members of the Class were damaged by Defendants in an identical manner.  Further, their claims arise from the same factual background and under the same legal theories.

**Adequacy of Representation**

103.   Plaintiff will fairly and adequately protect the interests of absent

Members of the Class and has retained counsel competent and experienced in

litigating complex litigation such as this case.   Plaintiff's interests are coincident

with, and not antagonistic to, the interests of absent Members of the Class because,

by proving its individual claims, Plaintiff will necessarily prove Defendants'

liability as to the respective Class Members' claims.   Plaintiff is also cognizant of,

and determined to faithfully discharge, its fiduciary duties to the absent Members

of the Class.

**Superiority**

104.   A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.   The expense and burden of individual

litigation makes it difficult for Members of the Class to seek redress individually

for the wrongs complained of herein.

**Manageability**

105.   There are no unusual difficulties likely to be encountered in the

management of this action as a Class Action that could not be managed by this

Court.   The advantages of maintaining the action as a Class Action far outweigh

the expense and waste of judicial resources that would result in hundreds (or

thousands) of separate adjudications of these issues for each Member of the Class.

48

106. Class treatment further insures uniformity and consistency in results and will provide optimum compensation to Members of the Class for their injuries.

**Universally Applicable Conduct**

107. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with regard to Members of the Class as a whole and certification of the Class proper.

**Predominance and Commonality**

108. The questions of law and fact common to the claims of each Member of the Class overwhelmingly predominate over any questions of law or fact affecting only individual Members thereof. Questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a) Whether Defendants disseminated a false and misleading Proxy Statement and other misrepresentations to NASD Members;

(b) Whether the suffrage rights of Plaintiff and the Members of the Class have been violated in connection therewith;

(c) Whether the Officer Defendants and Defendant Brueckner have breached the fiduciary duties they owed to Plaintiff and the members of the Class by acting as set forth herein;

(d) Whether Plaintiff and the Members of the Class have been damaged as a result of the wrongdoing described herein;

49

(e)   Whether Plaintiff and the Members of the Class have been
damaged as a result of the wrongdoing described herein;

(d)   Whether and to what extent Plaintiffs have sustained economic and
non-economic damages and the proper measure for such damages;
and

(e)   Whether the Officer Defendants have been unjustly enriched by the
foregoing conduct.

## COUNT I

## BREACH OF FIDUCIARY DUTY OF CARE
### (against the Officer Defendants and Defendant Brueckner)

109.   Plaintiff repeats and realleges each and every allegation set forth

above as though stated fully herein.

110.   The Defendants other than NASD itself, by virtue of their senior

positions as executives and/or member-elected members of NASD's Board of

Governors, owed fiduciary duties to Plaintiff and the Members of the Class.  Such

duties include the primary duties of care, loyalty and good faith, as well as a duty

of disclosure (or candor) arising from those three primary duties.

111.   These Defendants had a duty under Delaware law to disclose all

material facts that would have a significant impact on NASD Members' votes at or

in connection with the Special Meeting.  Their issuance and dissemination of the

Proxy Statement and other misrepresentations and omissions to Plaintiff and the

Members of the Class did not satisfy such obligations.

50

112.    Material omissions or misstatements Defendants made or caused to be made in the Proxy Statement and elsewhere include, but are not necessarily limited to: (1) the representation that a payment to Members greater than $35,000 was not possible for tax or other reasons; (2) the representation that, if the Transaction were not consummated, there was a substantial likelihood, that the SEC would unilaterally restructure NASD in a manner less favorable to NASD and its Membership and involving no payment to Members; (3) the failure to disclose alternative structures considered by the Board and why they were rejected; (4) the failure to disclose the process undertaken by the Board to determine the structure of the proposed Transaction and the size of the special member payment; and (5) the failure to disclose the value of any efficiencies that would be achieved by the Transaction.

113.    The Proxy Statement and other statements specified above misrepresented material facts with respect to the special member payment, the Transaction and by-law amendments and omitted other material facts that should have been disclosed in connection therewith.  The Proxy Statement was not a neutral, complete, candid or straightforward portrayal of the material facts relevant to the Transaction or the by-law amendments.

114.   Defendants breached their duty of care in issuing the false and misleading Proxy Statement, and failing to consider alternatives that would have been more beneficial to the Members of the Class.

115.   As a direct consequence of Defendants' breaches of fiduciary duty, Plaintiff and Members of the Class have been irreparably harmed and damaged in an amount that cannot presently be calculated.

## COUNT II

### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (against the Officer Defendants and Defendant Brueckner)

116.   Plaintiff repeats and realleges each and every allegation set forth above as though stated fully herein.

117.   The Transaction resulted in the enrichment of dual Members of NYSE and NASD, and of the Officer Defendants by virtue of their excessive salaries and benefits and otherwise, at the expense of the broader Membership of NASD, who are Members of the Class herein.

118.   Defendants breached their fiduciary duty of loyalty by issuing and disseminating the false and misleading Proxy Statement and making other misrepresentations, and failing to consider alternatives that would have been more beneficial to the Members of the Class.

119.   As a direct consequence of Defendants' breaches of fiduciary duty, Plaintiff and Members of the Class have been irreparably harmed and damaged in an amount that cannot presently be calculated.

## COUNT III

### BREACH OF FIDUCIARY DUTY OF GOOD FAITH
### (against the Officer Defendants and Defendant Brueckner)

120.   Plaintiff repeats and realleges each and every allegation set forth above as though stated fully herein.

121.   Defendants breached their fiduciary duty to act in good faith in issuing the false and misleading Proxy Statement and other misrepresentations, and failing to consider alternatives that would have been more beneficial to the Members of the Class.

122.   As a direct consequence of Defendants' breaches of fiduciary duty, Plaintiff and Members of the Class have been irreparably harmed and damaged in an amount that cannot presently be calculated.

## COUNT IV

### NEGLIGENT MISREPRESENTATION
### (against all Defendants)

123.   Plaintiff repeats and realleges each and every allegation set forth above as though stated fully herein.

124.   In disseminating the Proxy Statement and other misrepresentations specified above, each of the Defendants negligently caused statements to be made which they knew or should have known would mislead Members of the Class with respect to, among other things, the proposed per-member special payment and the circumstances surrounding the determination thereof.

125.   As a direct consequence of the Defendants' negligent misrepresentations or omissions of material facts in the Proxy Statement and elsewhere, Plaintiff and Members of the Class have been irreparably harmed and damaged in an amount that cannot presently be calculated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

    a.  certifying this action as a Class Action, with Plaintiff and its counsel as the representatives of the Class and Class Counsel, respectively;

    b.  declaring that the Proxy Statement and solicitation of Members' votes and representations in connection therewith did not comply with Delaware law;

    c.  declaring that the actions of Defendants were illegal and otherwise violated the rights of Plaintiff and the Members of the Class;

   d.  awarding to Plaintiff and the Members of the Class compensatory and punitive damages as appropriate;

   e.  ordering FINRA to account for the amounts wrongfully withheld from Plaintiff and the Class and requiring it to disgorge such amounts;

   f.  awarding to Plaintiff and the Members of the Class pre- and post-judgment interest;

   g.  awarding Plaintiff its costs of suit, including reasonable attorneys' and experts' fees; and

   h.  such other and further relief as the Court deems just and proper.

   i.  None of this relief aims to bar or to undo the Transaction.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all Counts so triable.

December 23, 2008

CUNEO, GILBERT & LADUCA, LLP

By: _Jonathan W. Cuneo_

Jonathan W. Cuneo (JC1112)
William H. Anderson
Matthew E. Miller
Brent Walton
507 C Street, N.E.
Washington, D.C. 20002
Telephone: (202) 789-3960

GREENFIELD & GOODMAN, LLC

By: _Richard D. Greenfield, by JW_

Richard D. Greenfield (RG 4046)
250 Hudson Street 8th Floor
New York, N.Y. 10013
Telephone:  (410) 320-5931

KELLER ROHRBACK LLP
Lynn Lincoln Sarko
Juli Farris
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone: (206) 623-1900


*Counsel for Plaintiff Benchmark Financial Services, Inc.*